# UNITED STATES DISTRICT COURT
### District of Kansas
(Kansas City Docket)

UNITED STATES OF AMERICA,

        **Plaintiff,**

    **v.**                    **CASE NO.**  21-20017-DDC-JPO

**DARREN L. ATTEBERY**             **UNDER SEAL**
**and**
**JOSHUA RODRIGUEZ,**

        **Defendants.**

# INDICTMENT

**THE GRAND JURY CHARGES**:

## INTRODUCTION

At all times relevant to this Indictment:

***The Defendant and Related Entities***

1.   Defendant Darren L. Attebery was a resident of Las Vegas, Nevada, and a director of the not-for-profit Animal Life Society ("ALS"). ALS was registered in the State of Kansas in September 2017. Defendant Attebery was also the registered agent for ALS.

1

2.  Defendant Joshua Rodriguez was a resident of Las Vegas, Nevada.

3.  Tickets Ole" was not an incorporated entity in either Nevada or Kansas.

Defendant Rodriguez claimed to be a 100% owner of Tickets Ole.

### The Small Business Administration

4.  The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses.  The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.  As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders. These loans have government-backed guarantees.

### The Paycheck Protection Program

5.  The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020, and, among other things, was designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

6.  To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business, through its authorized representative, to

acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

7.   When a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were guaranteed by the SBA.  Data from the application, including information about the borrower, the total amount of the loan, and the number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

8.   PPP loan proceeds were required to be used for certain permissible expenses, including payroll costs, mortgage interest, rent, and utilities.  Under the applicable PPP rules and guidance, the interest and principal on the PPP loan was eligible for forgiveness if the business spent the loan proceeds on these expense items within a designated period of time and used a certain portion of the loan towards payroll expenses.

***The Economic Injury Disaster Loan ("EIDL") Program***

9.   The Economic Injury Disaster Loan ("EIDL") Program, which was administered through the Small Business Administration ("SBA"), offered loans to small business owners who had suffered an economic loss during a natural disaster. Congress expanded the financial resources of the EIDL program when it enacted the CARES Act.  Under the CARES Act, the EIDL program expanded its eligibility to include loans for non-profit

organizations, sole proprietors, and independent contractors.   The CARES Act also authorized the SBA to provide EIDL loans of up to $2 million per loan.   The CARES Act authorized the SBA to issue loan advances up to $10,000 to small entities.   The amount of the advance was determined by an entity's number of employees and the advances do not have to be repaid.

10.   In order to obtain an EIDL loan and/or advance, a qualifying business must have submitted an application to the SBA and provide particular information about its operations, such as the number of employees, and the gross revenues and costs of goods sold for the 12-month period preceding January 31, 2020. The amount of the loan, if the application was approved, was determined, in part, on the information provided by the applicant about the employment, revenue, and cost of goods, as described above. The loan applicant must also certify that all information provided in the application was true and correct to the best of the applicant's knowledge.

11.   EIDL applications were submitted directly to the SBA.   Further, any funds issued under an EIDL loan or advance were issued directly by the SBA. EIDL funds could be used for payroll expenses, sick leave, production costs, and fixed debts, such as utilities, rent, and mortgage payments.

***Relevant Financial Institutions and Related Entities***

12.   Bank 1 was a federally insured financial institution based in New Jersey. Bank 1 participated in the SBA's PPP as a lender and, as such, was authorized to lend funds to eligible borrowers under the terms of the PPP.

13.   Company 1 specialized in providing online financial technology and services to consumers and small businesses through an automated lending platform.   Company 1 was based in Atlanta, Georgia.  Company 1 participated in the SBA's PPP by, among other things, acting as a service provider between small businesses and certain banks including Bank 1.  Small businesses seeking PPP loans could apply through Company 1 for PPP loans.  Company 1 reviewed the loan applications.  If a loan application received by Company 1 was approved for funding, a partner bank, such as Bank 1, disbursed the loan funds to the applicant.

14.   Bank 2 was a federally insured financial institution based in Virginia. Defendant Rodriguez had an account at Bank 2.

15.   Company 2 specialized in providing online financial services to consumers and small businesses.   Company 2 had its headquarters based in San Jose, California. Company 2 participated in the SBA's PPP by, among other things, acting as a service provider between small businesses and a bank.  Small businesses seeking PPP loans could apply through Company 2's website for PPP loans.  Company 2 reviewed the loan applications.  If a loan application received by Company 2 was approved for funding, a partner bank disbursed the loan funds to the applicant.

<u>The Scheme to Defraud</u>

16.   Beginning in or around April 2020, and continuing until in or around May 2020, Defendant Attebery and Defendant Rodriguez devised a scheme to defraud the SBA by filing false and fraudulent applications for PPP and EIDL funds.  As part of the scheme, in or around April 2020, Defendant Attebery submitted, via wire transmission, a

certificate of reinstatement or renewal for ALS to the Kansas Secretary of State since the company's authority to do business in Kansas had expired and this renewal was needed to further the scheme.

Purpose of the Scheme to Defraud

17.  The purpose of the scheme was for the defendants to unjustly enrich themselves by obtaining PPP loan proceeds under false and fraudulent pretenses, including by making false statements about the active status of ALS, its number of employees, and the intended use of the loan proceeds.

Manner and Means of the Conspiracy and Scheme to Defraud

18.  On or about April 9, 2020, in furtherance of the scheme to defraud, Defendant Attebery submitted a false and misleading PPP application to Bank 1 in the name of ALS seeking approximately $97,833 in PPP funds (the "Bank 1 PPP Application").  The Bank 1 PPP Application was electronically signed by Defendant Attebery.  Defendant Attebery also certified in the loan application that the application and related information provided to Bank 1 was accurate and complete.

19.  In the Bank 1 PPP Application, Defendant Attebery falsely stated that ALS' average monthly payroll was approximately $39,133 and that the company had 8 employees.  In addition, Defendant Attebery submitted false bank statements in support of the application. The bank records were false in that the records showed various financial activity for ALS, including various payroll activity, when in fact there was no such activity.

20.  In or around April 2020, Bank 1 rejected the application because Bank 1 identified irregularities concerning the bank statements provided by Defendant Attebery during the application process.

21.  In furtherance of the scheme, on or about May 1, 2020, Defendant Attebery submitted a false and misleading PPP application to Company 1 in the name of ALS seeking approximately $97,833 in PPP funds (the "Company 1 PPP Application").  The Company 1 PPP Application was signed by Defendant Attebery.  Defendant Attebery certified that the application and the information provided in all supporting documents and forms was true and accurate.

22.  The Company 1 PPP Application falsely stated that ALS' average monthly payroll was approximately $39,134 and that the company had 8 employees.  In addition, defendant Darren L. Attebery submitted with the Company 1 PPP Application what purported to be IRS Form W-3 for year 2019.  On the purported IRS Form W-3, Attebery falsely claimed that in 2019, ALS had approximately $469,600 in wages, tips, and other compensation.

23.  Ultimately, the Company 1 PPP Application was approved and processed on behalf of Bank 1, which funded the approximately PPP loan in the amount of $97,833 on or around May 1, 2020.  On or around May 4, 2020, Bank 1 distributed approximately $97,833 to Defendant Attebery through a wire transfer sent to an account held at HSBC Bank.

24.  Between May 18, 2020 to May 28, 2020, Defendant Attebery transferred PPP loan funds from the HSBC account to a Navy Federal Credit Union account held by Defendant Rodriguez who subsequently took out numerous cash withdrawals.

25.  The defendants' scheme caused losses of at least $97,833, based on the fraudulent PPP loan application submitted to Bank 1 and Company 1.

### The Denied Loan Application

26.  On or about April 24, 2020, Defendant Rodriguez submitted a loan application for a PPP loan for Tickets Ole.  The loan application sought a PPP loan in the amount of $228,750.  In the loan application, Defendant Rodriguez claimed that he operated Tickets Ole, which was a sole proprietorship.

27.  In the application, Defendant Rodriguez falsely claimed that Tickets Ole had twelve employees.  Defendant Rodriguez falsely claimed that Tickets Ole had monthly payroll expenses of $91,500, which was false. The PPP loan was denied.

### The EIDL Loan Applications

28.  On or about April 5, 2020, Defendant Rodriguez submitted an EIDL loan application.  In the loan application, Defendant Rodriguez falsely claimed the he operated a roofing/siding business.  Defendant Rodriguez falsely claimed that he had seven employees working for him.  Although the loan was ultimately denied, Defendant Rodriguez received a $7000 advance on the loan on or about June 30, 2020.  The advance was deposited via a wire transfer into Defendant Rodriguez's bank account at Bank 2.

29.  Also on or about April 5, 2020, Defendant Attebery submitted an EIDL loan application.  In the loan application, Defendant Attebery falsely claimed that he operated

a construction contracting business named "Darren Sales."  In the loan application, Defendant Atteberry falsely claimed that the business received $80,000 in gross revenue for the twelve months prior to January 31, 2020, that the business had $40,000 in costs of goods sold during that time, and that the business had $18,000 in rental losses due to the pandemic during that time.

30.  On or about April 6, 2020, Defendant Attebery submitted an EIDL loan application for ALS.  In the loan application, Defendant Attebery falsely claimed that ALS had gross revenue of $150,000  in gross revenue for the twelve months prior to January 31, 2020, that the non-profit business had $85,000 in costs of operation during that time, and that the business had $30,000 in rental losses due to the pandemic during that time.  This application was denied.

31.  On or about June 24, 2020, Defendant Rodriguez submitted another EIDL loan application.  This loan application also falsely claimed that Rodriguez operated a roofing/siding business.  In the loan application, Defendant Rodriguez falsely claimed that the business had $70,000 in gross revenue in the twelve months prior to January 31, 2020, that the business had $20,000 in costs of goods sold, and that the business had $15,000 in rental losses due to the pandemic during that time. This loan application was denied.

## COUNT 1

### CONSPIRACY TO COMMIT WIRE FRAUD
### [18 U.S.C. § 1349]

32.  Paragraphs one through thirty-one are reincorporated and alleged herein.

33.  Beginning in or around April 2020, and continuing until in or around May 2020, in the District of Kansas and elsewhere, the defendants,

**DARREN L. ATTEBERRY**
**and**
**JOSHUA RODRIGUEZ,**

knowingly and willfully conspired and agreed with each other and with other persons known and unknown to the Grand Jury to commit and conceal offenses against the United States by voluntarily and intentionally devising and executing and attempting to execute by interstate wire a scheme to defraud and obtain money and other property by means of false and fraudulent pretenses, representations, and omissions of material fact, in violation of Title 18, United States Code, Sections 1343 and 2.

34.  This was all in violation of Title 18, United States Code, Section 1349.

## FORFEITURE NOTICE

35.  The allegations contained in Count One of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

36.  Upon conviction of one or more of the offenses set forth in Count One of this Indictment, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.  The property to be forfeited includes, but is not limited to, the following:

10

A.      A forfeiture judgment imposed against each defendant in an amount that equals the amount of gross proceeds obtained by that defendant.

37.  If any of the property described above, as a result of any act or omission of the defendants:

A.      cannot be located upon the exercise of due diligence;

B.      has been transferred or sold to, or deposited with, a third party;

C.      has been placed beyond the jurisdiction of the court;

D.      has been substantially diminished in value; or

E.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.

May 5, 2021 _____            s/Foreperson_____
DATE                                                 FOREPERSON OF THE GRAND JURY

DUSTON J. SLINKARD
ACTING UNITED STATES ATTORNEY

By: /s/ D. Christopher Oakley_____
D. Christopher Oakley
Assistant United States Attorney
District of Kansas
500 State Avenue, Suite 360
Kansas City, Kansas  66101

11

Ph: (913) 551-6730
Fax: (913) 551-6541
Email: chris.oakley@usdoj.gov
Ks. S. Ct. No. 19248

IT IS REQUESTED THAT THE TRIAL BE HELD IN KANSAS CITY, KANSAS

## PENALTIES

**Count One Conspiracy to Commit Wire Fraud**

Punishable by a term of imprisonment of not more than twenty (20) years.  18 U.S.C. § 1349 and 1343.

A term of supervised release of not more than three (3) years.  18 U.S.C. § 3583(b)(2).

A fine not to exceed $250,000.  18 U.S.C. § 3571(b)(3).  In the alternative, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss.  18 U.S.C. § 3571(d).

A mandatory special assessment of $100.00.  18 U.S.C. § 3013(a)(2)(A).

Forfeiture.